Good morning. Good morning, Your Honors. I'm William Thomas, and I represent Phyllis Barker Smith in this matter. This is an appeal from a granting of a summary judgment against my client. The case involves is basically a First Amendment case. It's before this court. Excuse me. There's another component to that that is that was remanded back to state court dealing with state court claims. Before this court right now, though, is strictly the First Amendment claims that she had. Mr. Smith, she was prevented from speaking. Let me back up. She was a principal for a charter school in Eagle, Idaho. The school went through some significant financial difficulties with the issuance of a bond. There are some issues with regard to how the bond itself was procured. Issues with regard to how the what representations were made to potential investors and a schism developed between the board from North Star Charter School and and Miss Smith, as well as from outside consultants, Jim Blanford and John Buck, who were the bond people in this putting the deal together. Maybe we can go right to the question. I think one of the key questions here for this case, and that is putting aside whether Miss Smith's right to speak was or was not protected. Why was it clearly established that Miss Smith had a protected right to speak? I believe it was clearly established because the law has been long standing in the Ninth Circuit. Actually, going back to the Pickering case, that speaking on issues of public waste on financial conditions in an academic setting in schools is a matter of public. What's your strongest authority? Sorry. What's your strongest authority for? I would I would say probably the Pickering case. I've also cited some other. You've cited Demers. The Kaiser case versus Sacramento schools and Creighton versus City of Livingston. OK, but you also have to contend with Garcetti because it makes it pretty clear that a person whose job duties include making official statements don't have the same rights as a teacher who is and is in Pickering, who is writing, complaining about the board's financial mismanagement or whatever, because that's not part of her duties. In this case, we have the principal who is speaking as principal, purporting to speak on behalf of the school as part of her official duties. I think that is part of our appeal is that the court improperly found that by looking at looking at the facts of the case and ignoring one particular fact, and that is that even if she started out having financial reporting obligations during during the course of her principalship, that was stripped from her in April when she was put on administrative leave, specifically having all of her financial duties and human resource duties were taken away from her. Yes, but her timeline that she wanted to take public was prepared while she was in that arena, had those duties. I'm looking at two exhibits that I'd like you to explain why they don't fit squarely within Garcetti. They post-date the time when she was stripped of the financial responsibilities, but it's exhibit ER-253 and ER-160. And ER-160, ER-253 is the email exchange between Carrie Hoffman and your client talking about making a, she wanted to make a presentation and he's saying, well, you're not doing the things I asked you to do. And then there's the email exchange on, which is 160, on April 24th, a couple days later. And as I understand it, attached is a proposed email that your client wanted to distribute about an IC update meeting. Yes. Okay. And she's signing that as Principal Smith. And she is purporting to, in that capacity as Principal Smith, is first on the agenda will be a timeline of events that led to where we are now. And then we will organize a task force. And that's the very timeline that the board has been saying that is not something that we want to be discussed. Now, that may be right or wrong, whatever their motivations. But as an official statement coming from Principal Smith, how do you get around official duties? Because she's purporting to act in her official capacity, isn't she? Well, if I can back up to the April 24th email exchange, that was after she was taken, her financial duties were taken away from her. That's what I said. That's what I said. And she wants, as principal, to communicate to a mixed audience of staff and parents and whatever. And she wants to, as principal, communicate what before her financial duties were stripped. And Garcetti says you look to the actual circumstances, not just what, you know, job descriptions are and the like. So when she's writing in this mode proposing to speak as a principal to an assembled group, which is part of her duties, speaking and communicating on behalf of the school, remained part of her duties, did it not? I don't believe that it did, Your Honor. I think that especially in light of the latest take, I guess, on Garcetti and in the Demers case. I was on that too. In talking about the fact that, you know, the Garcetti duties test does not apply in the academic setting. It does apply in a higher academic setting. That was in colleges. Okay. I think that if I were you in this case, we would be extending Garcetti back down to the field. I was also on Garcetti. They got reversed. I'm at a distinct disadvantage, Your Honor, in that case, in that matter. Do I believe, well, I think your question is, was she speaking as part of her duties during the timeframe that you're talking about? And I think that it was a very compressed, intense timeframe in terms of what was actually going on. The operative timeframe really was the end of February through early May when most of the stuff was taking place. And I don't know that Ms. Smith actually understood what exactly her position was at that time. Her title, if you will, was principal. There's no question about that. But what job duties that encompassed, I don't know that she specifically knew or understood that they had changed or they hadn't changed. Well, that's just an – I'm sympathetic to what you're saying, I believe you. I got, as I say, I got reversed in Garcetti with the Supreme Court, so I'm trying to be faithful to our masters. So as Judge Merguia posited, assume that it's – what she said, it's unclear what her situation was. But it was apparently unclear to both parties. And so why would it be clear to the board that telling her not to communicate this timeline, which they'd been telling her all along, somehow magically she was freed up and could not be told not to communicate that at this proposed meeting, why would they not be entitled to qualified immunity because it wasn't clearly, it still isn't probably, clearly established what her position was? I believe, Your Honor, the essence of this particular appeal right now is whether or not the lower court overstepped its bounds in terms of finding, factual finding, in terms of who believed what at what time, that this court decided, looked at it as what could a reasonable board have believed and what should it have looked at, I mean, in terms of its opinion. I think it engaged in that fact finding. I think that the conclusion could be reached, of course it could be reached, but I think it's improper at the summary judgment stage to go through that particular process. I think it's one that's appropriate for a jury to hear. So do I understand your argument that because she was no longer, or she had been relieved of her responsibility of the financial duties or financial aspect of the job of principal of that school, you're saying because of that, regardless that she was still principal and an official of the school, the board should have clearly known that she was free to talk about a matter of public interest. That's your argument. That's my argument, Your Honor, and I would say that, you know, that at that point she was speaking as a private citizen in terms of, I mean, even if you assume. Even though she signed it as principal and she was going to talk about this timeline. I don't think she would have signed as private citizen. I mean, you know, in terms of that, other than the fact that that was her title, that was the title that they gave her. And even though with the English job duties. But don't you agree that that possibly could have been very confusing for the board? I think there was a lot of confusion there, Your Honor, yes. And then doesn't that go to whether or not it was clearly established? I disagree with that because I think clearly established, at least as I read through the cases, I think clearly established had to do with what the topic of what she was talking about, which was never inquired into by the lower court. The topic was the financial mismanagement of the school. And I think that it's long been established in the Ninth Circuit that financial mismanagement is a topic of public concern. What were the groups she was going to speak in front of? Would she have access to them if she was not the principal? I'm sorry. The groups that she wanted to speak in front of, what were they? They were, I think they were the stakeholders in general, which included parents, including staff members, and included probably even the board. Well, would she be able to stand up and talk to these groups unless she were the principal? I believe she could talk to stakeholders or to parents any time she wanted to. Whenever there was a meeting, right? Yes. So she could have, if the board had said, don't do this, and then she had gone to the meeting, does this all happen? I'm just looking at the preliminary documentation. What you're saying is she could, without sending out this notice to people, she then could have attended the stakeholders meeting and stood up and said, you all ought to know that I've got this timeline, and if any of you wants to see it or, in other words, put it out. She could have done that. Yes. So why didn't she? I don't know the answer to that. The question was never asked. I see. Okay. And I think I'm running out of time. Okay. My name is Brian Julian. I represent the individual board members and the financial manager, Mr. Colburn, in this matter. May it please the court, counsel, I will take approximately seven minutes. And because we do have three of us arguing, I'll try to get to the point. This is a case about qualified immunity. The standard is, was the right clearly established at the time of the actor's decision or action, and under circumstances, could the actor have reasonably but mistakenly believed that his or her conduct did not violate a clearly established right? The purpose of qualified immunity has been stated many times, but by the U.S. Supreme Court probably most clearly. It's also been stated by the circuit many times. You might want to use your time getting to the merits of this case. But I think it's important is that qualified immunity provides ample protection to all but the plainly incompetent and those who knowingly violate the law. And I think if we jump over to the Judge Shub's articulation of the issue, it really comes in. And his issue was whether a reasonable official would have believed that he or she would not violate the law by refusing Smith's request to share North Star's financial situation and present her timeline to stakeholders and then not renewing her contract because of those requests. He held reasonable officials in the board member's position could have believed Smith intended to speak pursuant to her job as principal and not as a private citizen. And let's make it clear. She was asking for simply an opportunity to speak at a board meeting. It was clear that she was cloaked with authority. It is clear that under a charter school, it's almost even different than a regular school. It's operated under the Nonprofit Business Corporation Act. It is a public school, but she's effectively the superintendent. They call her principal, but she is in charge of budgeting. She is the one that reports to the board. She is their chief executive officer. And she had made several complaints about access in a limited forum, and the fact is Judge Shub was right is that she's different than an ordinary citizen. An ordinary citizen would not be allowed to comment in a school newspaper. An ordinary citizen would not have a right to speak at staff meetings. Would she have a right to speak at this update meeting? You know, it never happened. I do know this. In her deposition testimony, she said, yeah, I did have conversations. I spoke to staff outside of this meeting. Had she interrupted the process, I think the board would have been absolutely within their power to say, no, you don't have the floor. The chairman runs a meeting. It's a public meeting. It does not mean that everyone has public input into a meeting. So it would not surprise me if the board said, no, you don't have the floor. We don't want to hear history. And there was a reason behind this. Was she precluded, other than whatever the response was to this e-mail, from saying anything? Did the meeting happen? Was she precluded at the meeting? I don't know if she made a request at that meeting to speak anymore. I would have to speculate that at that meeting they did not want to hear her topic. And there's a reason for that. The reason was we have three new board members in 2010 from 2009. They're looking at a way of balancing the budget, which is very important that they move forward ahead. And it's a governmental decision here. I think the quote from Ms. Hoffman was, we just weren't interested in hearing a history lesson at that point. It was almost irrelevant. It was an excuse why the gate was left open and the cows went out, when, in fact, we were looking at refinancing the farm. It was beyond here, the real scope of the meeting. It was also, in many ways, a grievance, a personnel matter. This only came up a year and a half after the bonds were already sold. We're paying debt on them. They're done. And she wants to go in and say, well, the information that I told Mr. Blanford and Mr. Buck, and they can speak to this, was different, and I tried to explain that our pro forma projections were different. Our point was it really didn't have anything to do with our meeting. What the First Amendment is about, and Pickering does clearly establish, that people, teachers specifically, are some of the best informed about school management and how money is spent. So Pickering, would you agree, clearly establishes, A, the subject is a matter of public concern, even if the board doesn't think so, and B, that she as a citizen could have spoken if it was a forum in which the public could be expected to attend? And so I come back to my question. The question is whether you're under the clearly established law of Pickering or whether you're under the official duties limitation on Pickering, which is set forth in Garcetti. And I think you have an excellent point, Your Honor, is that since Pickering certainly citizens have a right to speak about financial well-being. We don't think it was relevant to the issue we were dealing with, and it was a very limited forum. It is like my wanting to speak about income inequality in the United States today. You would cut me off and say, no, let's talk about this case. That was all that was there. But she has that right. But I think the judge handled it appropriately. He said, assuming arguendo, it's free speech. Let's just make that assumption. Let's go beyond there. And he's assuming, for argument's sake, that she was non-renewed as an adverse employment action because of that speech. But even in light of that, with the Garcetti factors so intermixed with her relationship, would a reasonable school official, a charter school official, not the DA's office, as in Eng, not law enforcement officers, as in I can't think of the name of the case, and certainly not the sophistication of a school, but these are volunteers. These are volunteers who spend 20 hours a week, don't get paid, try to run a public school. Would they know, under those circumstances, but not giving her a forum on a topic they thought was not germane, was not helpful, would that violate a clearly established law? And the answer is clearly no. We simply can't ignore the fact that this is not. One thing the district court didn't seem to do, at least it wasn't apparent, was to factor in that she no longer had those financial duties and responsibilities. And just, you know, this is the point that we are at. I mean, we have to look at this in the light most favorable to Ms. Smith. On de novo review, I think we do. And whether or not to apply qualified immunity, and if you take the fact that she no longer had dealings with the financial aspect, doesn't this really align more with Pickering? Pickering gets us to the first step, and that is, is this protected speech? We're not contesting that. I think I personally could combat that, but now we're looking at simply good faith immunity. And at a public hearing, a school board meeting, does she have an absolute First Amendment right to inject herself into the agenda, take over the floor, and start speaking? No. The First Amendment does not give a right for insubordination of an employee, particularly when it's your top executive. How about Moran, the case of Moran? What do you do with that? Which case? Moran, I think it's where it says, although the question whether public employee speech is constitutionally protected is rarely, if ever, clearly established to preclude qualified immunity. Well, Moran dealt with a deputy public commissioner, and the court ruled that you had a right to actually control that as an administrator, much as in Moran, using the board spokesman. As in Moran, her only access to this information stemmed from the fact that she was hired as a principal. Julian, the board members knew that they had stripped her of the financial investigation and reporting duties. True? Yes. They had done so? Yes. So there was no doubt in their minds that she was not making an official report, as was Mr. Garcetti when he was reporting that the applications for search warrants were improperly done. So there's no question that the board members knew that she would be speaking outside her duties. Why isn't Spickering? Respectfully, I disagree. And I disagree. She is still the principal. She still is going to be in charge. You cannot talk about financial matters as our representative. You're stripped of those duties. She is fine to go speak to financial matters. She can write a letter to the editor. She can go speak to groups. She just can't interrupt our meeting. This is about a limited forum and a chance to inject yourself in an official public meeting or put yourself on an official newsletter, and she doesn't get to do that. At that public meeting, there was no time set aside for public discussion, for public comments? It was a discussion by the board. Well, what about the stakeholders meeting? It was not an open. This isn't like a planning and zoning commission where everyone gets to the floor. No. What's the I.C. update meeting? I'm not sure. Well, why are you saying that? I mean, this is what she purported to proffer to an I.C. update meeting, and she was told she couldn't do it. Well, I'm getting a little bit confused with this record. I've been studying it for so long. My understanding was this was a different agenda than speaking about the bond issuance. It was about whether or not we could make our bills paid by the end of the year. They thought that she would have been disruptive, inconsistent. They didn't give her a floor then. She still had a right as a private citizen to go out and speak, but just not at this place. And under Garcetti, that is the law. They're allowed to do that. Thank you. Okay. May it please the Court, Keeley Duke on behalf of R.W. Baird & Company and Jim Blanford, cutting right to the chase with respect to my clients. The issue here is whether or not Mr. Blanford was a state actor. We submit that the record is abundantly clear that he was not a state actor as found by Judge Shub. As the Court is well aware, there are multiple tests that are used to determine whether someone is acting in a state actor capacity. The joint action and the governmental nexus tests are the tests that it appears plaintiffs are focusing on here. When you turn to those and you really focus in on governmental nexus, I don't, in all fairness, really see how that applies. I think it's really the joint action test that plaintiff is attempting to force themselves under. You need to look to see that the state officials and Mr. Blanford would have acted in concert in effecting a particular deprivation of a constitutional right, that those actions are so inextricably intertwined with the government that that is what acting in concert is, and that you can also show that there's a willful participant in the conspiracy. Those are the Burnett and Sow cases that the Court's well familiar with. None of that can be established here. There's no evidence that Mr. Blanford or that Baird was advocating that anyone be fired because they wanted to exercise their First Amendment rights. Baird was engaged for investment services. There was no delegation of personnel decisions, as we indicated in our briefing. The Board is who decided to not permit Ms. Smith to present her timeline. Blanford did not. Ms. Smith agrees to that. North Star agrees to that and Carrie Pickett-Hoffman's affidavit that we've provided to you. And everyone agrees that it was all up to the Board. With respect to the March 8 letter, it was wholly devoid of any recommendation, instruction, or order that plaintiff's speech be restricted or that plaintiff's contract be terminated or not renewed. And so when you look to all of that, Your Honors, there's no evidence that Ms. Smith ever approached Blanford or Buck with a request to present her timeline to North Star's stakeholders or that they even knew about her intent to do so. No admissible evidence that either ordered the Board to forbid her from speaking, no evidence that either participated in the decision to keep her from presenting, and no evidence that either participated in the decision not to renew her contract. Therefore, no state actor. Lastly, with respect to Baird, respondeat superior, not appropriate, obviously under Taylor v. List, and there's no Monell case here. It wasn't pled, and there's certainly no official policy or custom of Baird that's being argued. So with that, Your Honors, unless you have any questions, I'll take my seat. Thank you. May it please the Court. My name is Josh Emmett, appearing on behalf of John Buck and Buck Financial LLC. I was going to make a joke about not being able to say anything in three minutes, and so now I have a minute. I'll be really quick. Under the state actor analysis, it is difficult for me to see on this record how Mr. Buck can never be found to have been a state actor with the school board. And I say that based largely on not only obviously the arguments in our briefing, but if the Court looks at the February 15, 2010 email of Mr. Buck, who at that point in time was an investor in these bonds, he communicated to Jim reading from this email, you can pass on to the school that I will be happy to get involved, but it will be on behalf of investors, not the school. Isn't it reasonable to infer because Mr. Buck, and I think Mr. Lamford as well, encouraged the board to gag Ms. Smith, that they also encouraged the board to terminate her? I don't think it is, Your Honor, because if you go back to the email where Mr. Buck suggested the mere possibility of terminating administrators, that doesn't sound like that's not retaliation. He never identified Ms. Smith by name. He was making the suggestion purely as an investor, which is his only capacity at the time. And so I don't think that's a fair conclusion to draw from the evidence in the case. It was solely within the board's authority to renew her contract or to terminate her. She was not terminated. Her contract simply wasn't renewed. And what my client did was simply to suggest that if necessary, administrators may need to be fired. So I don't think that's a fair conclusion to draw. She was one of the few administrators at this charter school, wasn't she? She was. But it's still, there is no specific, he never, my client never said, as counsel admitted at oral argument from Ms. Smith, never suggested that she be terminated for speaking out, and never suggested that she be terminated or her contract not be renewed for wishing to speak out. So getting back to the email real quickly, how a court could conclude that there is a symbiotic relationship between my client and the school and or that they were inextricably intertwined. Again, it isn't supported by this record, especially when you look at an email where my client is saying, I'm not saying these things on behalf of the school. I'm actually taking a position contrary to the school, which is asking to refinance these bonds. And I, as an investor, am saying no. So thank you. Mr. Smith will give you a moment. Do you have no rebuttal? Thank you. All right, the case of Smith versus Charter School, Northside Charter School is submitted. And that concludes our hearings for the day. Court is adjourned.
judges: Fisher, Bea, Murguia